# IN THE COURT OF APPEALS OF IOWA

No. 18-0930
Filed August 21, 2019

**JOSE LUIS AGUILAR OLVERA,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Emmet County, Nancy L. Whittenburg, Judge.

A postconviction applicant appeals the denial of relief from his life sentence for sexual abuse of a child. **AFFIRMED.**

Michael H. Johnson, Spirit Lake, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Jose Luis Aguilar Olvera (Aguilar) appeals the denial of his petition for postconviction relief. Aguilar is serving life in prison for first-degree sexual abuse. Following a bench trial, the district court found Aguilar committed sex acts against his girlfriend's six-year-old daughter, J.L.M. Through that sexual contact, Aguilar infected J.L.M. with herpes simplex virus 2 (HSV2). That infection caused J.L.M. "severe emotional and physical pain associated with the [herpes] lesions in her private area."

In his postconviction action, Aguilar tried to unravel the evidence linking him to J.L.M.'s herpes infection. Aguilar alleged his trial attorneys were ineffective in allowing him to submit blood and saliva samples under a nontestimonial identification order. *See* Iowa Code § 810.1 (2013). The postconviction court explained a "subtext to Aguilar's claim" was that "he may not have understood the procedures because his first language is not English." The court then rejected Aguilar's allegations, finding his attorneys had no duty to pursue meritless objections to the State's collection of samples. After reviewing the criminal and postconviction records, we likewise find Aguilar did not prove his attorneys performed below professional norms by not objecting to the nontestimonial identification procedures. We thus affirm the denial of postconviction relief.

I.      **Facts and Prior Proceedings**

Aguilar and his girlfriend, Carmelina, brought J.L.M. to a clinic because the six-year-old child was experiencing painful urination in late October 2012. A nurse practitioner noted J.L.M. had an infection in the perineal area between her vagina and anus. Two days later, another adult accompanied J.L.M. for her return visit to

the clinic. The child was "in excruciating pain and having difficulty walking." The nurse practitioner counted more than a dozen "open lesions in J.L.M.'s genitalia." A specialist diagnosed J.L.M. with genital herpes. According to the medical testimony, HSV2 is "not curable" and "impairs the bodily function when there is an outbreak in that J.L.M. is unable to urinate normally." The virus is normally transmitted by skin-to-skin contact. The first outbreak occurs within four to twelve days of contact.

As a mandatory reporter, the nurse practitioner called the Iowa Department of Human Services (DHS) in early November 2012. A DHS child-abuse investigator learned Aguilar had lived with Carmelina and J.L.M. for about two years. During a November 2012 interview at the family residence, Aguilar acted as a translator because Carmelina spoke only Spanish and the investigator spoke only English.[1] Although the exchange was somewhat fragmented, Carmelina appeared to tell the DHS investigator that she took medication for a similar infection within the past year. The DHS placed J.L.M. in foster care.

Once she felt comfortable in her new placement, J.L.M. revealed to her foster mother and her therapist that Aguilar had sexual contact with her. After additional investigation, the Emmet County Sheriff filed a complaint and affidavit charging Aguilar with second-degree sexual abuse in October 2013. The prosecuting attorney applied under Iowa Code chapter 810 to detain Aguilar for obtaining saliva and blood samples. The application alleged the samples were necessary to verify if Aguilar had infected J.L.M. with HSV2. The district court

---

[1] The child-abuse investigator testified Aguilar understood and spoke English well.

approved the application on October 14, 2013, and ordered Aguilar to appear for nontestimonial procedures. Aguilar tested positive for HSV2.

Two weeks later, the State filed a trial information charging Aguilar with one count of sexual abuse in the first degree, a class "A" felony, and one count of sexual abuse in the second degree, a class "B" felony. Aguilar waived his right to a jury trial. During his bench trial, J.L.M. testified over closed-circuit television outside of Aguilar's physical presence.[2] She told the court Aguilar "hurt" her by "put[ting] his private stuff against her skin." J.L.M. circled on a diagram the part of her body where he touched her. J.L.M. recalled Aguilar sexually abused her three times while her mother was at work.

The district court considered J.L.M.'s testimony to be "extremely credible" and found Aguilar guilty as charged. The court sentenced him to concurrent terms of life and twenty-five years in prison. Our court affirmed his convictions. *See State v. Aguilar*, No. 14-1225, 2015 WL 5965076, at *7 (Iowa Ct. App. Oct. 15, 2015).

In his application for postconviction relief, Aguilar alleged he was denied his right to effective assistance of counsel because his criminal trial attorneys failed "to resist, quash, object to, or move to suppress a buccal swab and blood test of the defendant ordered by the [d]istrict [c]ourt on October 14, 2013." Aguilar and his trial attorneys, Edward Bjornstad and Gregory Jones, all testified at the postconviction trial. The district court denied relief. Aguilar appeals.

---

[2] The district court allowed the procedure under Iowa Code section 915.38 after finding J.L.M. would be traumatized by giving testimony in front of Aguilar.

## II. Scope and Standards of Review

We generally review the denial of postconviction relief to correct legal error. *Goode v. State*, 920 N.W.2d 520, 523 (Iowa 2018). But we engage in a de novo review when the claim for relief implicates a constitutional violation, such as ineffective assistance of counsel. *Linn v. State*, 929 N.W.2d 717, 729 (Iowa 2019).

Aguilar's petition alleged ineffective assistance under the state constitution only. *See* Iowa Const. art. I, § 10. Our supreme court has interpreted article I, section 10 as affording broader protections than its federal counterpart in some ways. *See, e.g.*, *State v. Young*, 863 N.W.2d 249, 278 (Iowa 2015) (precluding use of uncounseled misdemeanor convictions for enhancement purposes). But here, Aguilar recites the Sixth Amendment standard for ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We will thus apply that test. To succeed, Aguilar must prove by a preponderance of evidence: (1) his trial counsel failed to perform an essential duty, and (2) prejudice resulted from that failure. *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016).

## III. Analysis

Aguilar raises two claims of ineffective assistance on appeal: (1) trial counsel was ineffective for not ensuring Aguilar had an interpreter for a hearing on the State's motion for nontestimonial identification, for not explaining that motion to Aguilar, and for agreeing Aguilar would submit saliva and blood samples; and (2) trial counsel was ineffective for failing to investigate and present evidence that J.L.M. could have contracted HSV2 from someone other than him.

But Aguilar preserved error only on the first theory. The postconviction court did not rule on a claim addressing the scope of counsel's investigation into other

possible sources for J.L.M's infection.[3] And Aguilar did not request a ruling on that ground. We decline to consider the second claim for the first time on appeal. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("*Meier* distinguishes between the situation where error was preserved even though 'the record or ruling on appeal contains incomplete findings or conclusions' and the situation where the issue was 'not considered by' the district court and thus error was not preserved." (citing *Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002))).

Turning to his first theory, a bit of additional background is necessary to assess trial counsel's performance. Two attorneys represented Aguilar during his criminal case. After Aguilar's arrest, Edward Bjornstad entered an appearance. Bjornstad moved for bond review and represented Aguilar during the hearing on that motion on October 14, 2013. At that hearing, Aguilar told the court he spoke "a little bit" of English. Aguilar said he did not need an interpreter but having one would be "better." When asked if he understood the proceeding, Aguilar replied, "All right."

The October 14 proceeding addressed not only bond review, but also the State's motion for nontestimonial identification. Attorney Bjornstad said the defense did not resist that motion but did not consent to admission of the test results into evidence. The court explained it had already granted the State's request. Bjornstad asked Aguilar if he understood the State would obtain bodily samples, and Aguilar answered "yes."

---

[3] In its written findings and verdict, the criminal trial court decided, "Other propositions of how J.L.M. may have contracted herpes simplex virus 2 do not rise to a level of a reasonable doubt. It is a mere possibility."

A week later, the sheriff transported Aguilar from the jail to the clinic to have his blood drawn. The sample tested positive for HSV2.[4] With that information in hand, the State charged Aguilar with sexual abuse in the first degree. Because that offense was a class "A" felony, the court appointed Gregory Jones from the public defender's office to represent Aguilar. Attorney Jones did not seek to exclude the positive test results.[5]

In his postconviction action, Aguilar faulted both attorneys for their failure to object to the nontestimonial identification procedure. Partnered with that claim was Aguilar's regret over not having an interpreter at the October 14, 2013, hearing where his attorney asserted no objection to that procedure.[6]

Aguilar testified at the postconviction hearing he did not understand his defense attorney could challenge the order to provide a blood sample. He also asserted his attorneys did not discuss with him the possibility of excluding the blood test results.

Countering Aguilar's claims, neither criminal defense attorney believed a viable challenge existed. Bjornstad testified he communicated with his client

---

[4] During the postconviction hearing, the State also elicited testimony from Aguilar that a July 2013 blood test obtained during the child-welfare case showed he had the virus.

[5] But Jones attacked the results in another way. He moved to adjudicate a point of law questioning whether the legal definition of "serious injury" (the enhancing element for first-degree sexual abuse) included the sexual transmission of HSV2. The court declined to answer the question, concluding it was a function for the trier of fact. At the bench trial, Jones argued the State did not offer sufficient proof of serious injury. The court denied his motion for judgment of acquittal. The court held Aguilar's sex act infecting J.L.M. with HSV2 caused her serious injury—declining to differentiate between "an acute or latent injury." Although not ultimately successful, Jones pursued a sound trial strategy by concentrating on the State's proof of serious injury under these facts. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.").

[6] Aguilar had an interpreter at both his criminal and postconviction trials.

without an interpreter and Aguilar understood their conversations.[7] In one of those conversations, Bjornstad explained the nontestimonial identification order to Aguilar. The experienced criminal attorney told the court he "didn't believe there was sufficient grounds to quash the order." Both Bjornstad and Jones knew Aguilar had submitted a blood sample several months earlier in the child-welfare case that also showed he had the HSV2 virus. Jones testified that based on his research and years of experience, he didn't see any grounds to suppress the results of those two tests.

Like the district court, we find attorneys Bjornstad and Jones had no duty to object to the nontestimonial identification order without a promising basis for doing so. *See State v. Halverson*, 857 N.W.2d 632, 635 (Iowa 2015) ("Counsel, of course, does not provide ineffective assistance if the underlying claim is meritless."). Both defense counsel independently decided after researching the issue, that Iowa law permitted the State to obtain Aguilar's saliva and blood samples through the court order. *Cf. Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) (explaining attorneys' strategic decisions made after thorough investigation of the law and facts are "virtually unchallengeable" (quoting *Strickland*, 466 U.S. at 690–91)).

---

[7] Aguilar devotes about nine pages of his brief to the interpreter issue. We acknowledge Aguilar may have had a right to have an interpreter at the October 14, 2013 hearing. *See* Iowa Code § 622A.2. But we do not see attorney Bjornstad's failure to press that point as a material breach of duty. *See Avila v. State*, No. 15-1558, 2017 WL 1088099, at *3 (Iowa Ct. App. Mar. 22, 2017) (finding trial counsel did not breach an essential duty by failing to request an interpreter or object to the court's decision that an interpreter was not required). The postconviction court found Aguilar was "sufficiently proficient in English" to understand the discussion of the nontestimonial identification order.

Their decisions were well-founded. "Chapter 810 provides an avenue for the county attorney to obtain nontestimonial identification information from a suspect" even before his or her arrest. *Bousman v. Iowa Dist. Ct.*, 630 N.W.2d 789, 795 (Iowa 2001); *accord State v. Ripperger*, 514 N.W.2d 740, 746 (Iowa Ct. App. 1994). That information includes "blood and saliva samples." Iowa Code § 810.1. The district court may approve a prosecutor's request for nontestimonial identification when the application establishes:

> 1. That there is probable cause to believe that a felony described in the application has been committed.
> 2. That there are reasonable grounds to suspect that the person named or described in the application committed the felony and it is reasonable in view of the seriousness of the offense to subject that person to the requested nontestimonial identification procedures.
> 3. That the results of the requested nontestimonial identification procedures will be of material aid in determining whether the person named or described in the application committed the felony.
> 4. That such evidence cannot practicably be obtained from other sources.

*Id.* § 810.6.

That code section survived an attack on its constitutionality in *Bousman*. Our supreme court rejected Bousman's argument that the nontestimonial identification order "violated his constitutional rights solely because it was issued under a standard of reasonable grounds to suspect rather than probable cause." *Bousman*, 630 N.W.2d at 798 (reasoning saliva sampling did not involve a "significant intrusion into a person's bodily security"); *see also State v. Doss*, No. 05-1192, 2006 WL 1410191, at *3 (Iowa Ct. App. May 24, 2006) (equating bodily intrusion of obtaining blood or saliva sample (albeit after conviction) with taking fingerprints or a photograph). The *Bousman* court also found the lesser degree of

suspicion in the statute tolerable because the order issued only upon judicial authorization. *Id.* at 798–99.

Aguilar does not argue the State's application for nontestimonial identification failed to satisfy the four elements in section 810.6. Nor does he offer any antidote to the constitutional analysis in *Bousman*. In fact, Aguilar's brief does not even cite chapter 810 or *Bousman*.

Instead, Aguilar relies on *State v. Height*, which held a "compulsory medical examination" to see if the defendant had "the same venereal disease that had been contracted by the victim" violated "his bodily integrity" and thus "due process." *See* 91 N.W. 935, 939–40 (Iowa 1902) (describing physicians' physical exam of defendant's "private parts while he was confined in jail" on sexual abuse charges). Aguilar contends the drawing of his blood "by needle was at least as invasive, if not more so, than the examination performed in *Height*."

The State argues Aguilar's reliance on *Height* is misplaced. We agree.[8] *Height* held that "securing evidence by an invasion of the private person of the defendant" violated the due process clause of article I, section 9 of the Iowa Constitution. *Id.* at 940. In *Height*, "the examination by physicians was made under the direction of the prosecuting attorney" without prior court approval. *Id.* at 936. The *Height* court reasoned it would not be "unlawful to require defendant to uncover his face or hands, or take his feet from under a chair, in the courtroom, for purposes of identification." *Id.* at 938. But the *Height* court disapproved of

---

[8] We likewise reject Aguilar's reliance on *State v. Pettijohn*, 899 N.W.2d 1, 37–38 (Iowa 2017) (holding admission of warrantless breath test in drunken-boating prosecution violated article I, section 8 of the Iowa Constitution). *Pettijohn* did not address the nontestimonial identification procedure in chapter 810. *See* 899 N.W.2d at 37–38.

requiring "disclosure of those parts of the person not usually exposed" without due process. *Id.*

Sidestepping Aguilar's contention, we do not find it helpful to compare the intrusive nature of examining Height's "private parts" with the drawing of Aguilar's blood sample.[9] Instead, we look to the important development in the law over the last 100-odd years since *Height*—the legislature has enacted procedures for obtaining nontestimonial identification in felony cases. *See* Iowa Code ch. 810. Those procedures include the requirement of a written application by a prosecuting attorney, accompanied by at least one supporting affidavit, presented to the court for approval. *Id.* §§ 810.3, .4. The court can issue an order for nontestimonial identification only if the application meets the standards set out above. *Id.* § 810.6. The subject of the order has the right to counsel and the opportunity to request that the court modify or vacate the order. *Id.* §§ 810.8, .9. These statutory provisions ensure due process for the subject of the order.

Aguilar ignores these due-process safeguards in chapter 810 when insisting his attorneys were remiss in not objecting to the blood draw under the authority of *Height*. Dragged down by this incomplete line of reasoning, Aguilar fails to overcome the presumption counsel's performance was reasonable under prevailing professional norms.

**AFFIRMED.**

---

[9] We recognize drawing blood is a "physical intrusion, penetrating beneath the skin, [that] infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989).